## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## WESTERN DIVISION

| | |
|---|---|
| Shaquille Dukes, Credale Miles, and Marqwandrick Morrison, | |
| Plaintiffs, | |
| v. | Case No. 3:19-cv-50189 |
| Freeport Health Network Memorial Hospital, Ryan Godsil, City of Freeport, Illinois, Jeff Zalaznik, Dan Moore, and Justin Holden, | Honorable Iain D. Johnston |
| Defendants. | |

## MEMORANDUM OPINION AND ORDER

Shaquille Dukes was a patient at FHN Memorial Hospital in Freeport, Illinois. Co-Plaintiffs Credale Miles and Marqwandrick Morrison were visiting him. The three decided to go for a walk even though Dukes was still attached to an IV. Instead of walking around the hallways or even the hospital unit, they decided to walk around the block. Ryan Godsil, an FHN security guard, saw Plaintiffs walking on the sidewalk while pulling an IV, an unusual sight. Thinking Plaintiffs were stealing hospital equipment, he intervened. (A reasonable person might think that there would be easier ways to swipe an IV other than being admitted to a hospital and having it attached to one's arm.) The situation only devolved from there,

leading to the arrest of Dukes, Miles, and Morrison. Almost everything was recorded on video, albeit from different vantage points.[1]

Based on the encounter with FHN security and the police that day, Dukes, Miles, and Morrison bring this suit. Against FHN Memorial and Ryan Godsil ("Hospital Defendants"), they claim negligence, false imprisonment, and intentional infliction of emotional distress. Against the City of Freeport, Sergeant Jeff Zalaznik, and Officers Dan Moore and Justin Holden ("City Defendants"), Plaintiffs allege false arrest, violations of the equal protection clause, and willful and wanton conduct in violation of state law. Plaintiffs also bring a *Monell* claim against the City of Freeport. Dukes also claims a failure to provide medical treatment and a violation of his substantive due process rights. All Defendants move the Court for summary judgment. For the reasons explained in detail later, the City Defendants' motion [59] is granted, and the Hospital Defendants' motion for summary judgment [60] is granted in part, with the negligence claim being dismissed without prejudice.

## I.  Abstention

After review of the record on summary judgment, the Court realized that the state criminal charges remained pending in the Stephenson County Circuit Court.

---

[1] On numerous occasions, the Court has lamented the absence of police body camera recordings that would have captured critical evidence regarding an incident and conclusively resolved alleged disputes of fact and arguments of counsel. *See, e.g., Agnew v. Cater*, 18-cv-50035, 2022 U.S. Dist. LEXIS 31604, at *2 n. 1 (N.D. Ill. Feb. 23, 2022); *Pennie v. City of Rockford*, 19-cv-50120, 2022 U.S. Dist. LEXIS 19632, at *1-2 (N.D. Ill. Feb. 3, 2022). Not so here. The audio and video recordings have proved to be critical in determining this motion. Indeed, as shown throughout this order, the recordings have established that certain representations—by all sides—were incorrect. Without these recordings, this case likely would have gone to trial, with all the attendant expenses and burdens.

This fact was not previously disclosed by the parties, so the Court *sua sponte* raised whether abstention was required under *Younger v. Harris*, 401 U.S. 37 (1971). Dkt. 80.

Abstention doctrines often require that federal courts decline to exercise federal jurisdiction "where doing so would intrude upon the independence of the state courts and their ability to resolve the cases before them." *J.B. v. Woodward*, 997 F.3d 714, 721–22 (7th Cir. 2021) (quoting *SKS & Assocs. Inc. v. Dart*, 619 F.3d 674, 677 (7th Cir. 2010)). When exercising jurisdiction, federal courts must be cognizant of their decisions' effect on "principles of equity, comity, and federalism," which are "foundational to our federal constitutional structure." *Id.* at 722. Abstention under *Younger* arises in three situations: when federal court litigation would interfere with (1) ongoing state criminal proceedings, (2) state-initiated civil proceedings that are "akin to criminal prosecutions," or (3) civil proceedings that implicate a state's interest in enforcing orders and judgments of its courts. *Id.* Though federal courts have independent duties to ensure they have the authority to adjudicate cases and controversies, they also have a "virtually unflagging" duty to exercise their jurisdiction. *Ankenbrandt v. Richards*, 504 U.S. 689, 705 (1992). Indeed, abstention should be the exception—not the rule. *Sprint Communs., Inc. v. Jacobs*, 571 U.S. 69, 73 (2013).

In this case, the Court's concern lies with the criminal proceedings in state court that stem from the arrests of Dukes, Miles, and Morrison; the same arrests giving rise to this case. That concern, however, does not implicate the Hospital

Defendants, against whom Plaintiffs bring state-law claims that would not interfere with the state criminal proceedings.

Regarding the City Defendants, however, the Court became concerned that disposition of their motion for summary judgment may impinge on the federalism and comity concerns central to the holding in *Younger*. The Court ordered position papers and held a hearing, in which the parties indicated that the criminal proceedings were continued multiple times to allow this federal civil rights suit to conclude. The Court then sought and obtained consent to contact the circuit court judge (Judge James Hauser) directly.[2] Judge Hauser confirmed that the case had never been stayed, but that the parties had instead agreed to continue the proceedings multiple times in favor of the federal proceeding. Like all good judges, Judge Hauser simply wanted the cases to be resolved sooner rather than later. The Court then sought and obtained consent to contact the Stephenson County State's Attorney[3] and confirmed that the State consented to the resolution of this case first and waived its interests in federalism. *See Kurtz Invs. Ltd. v. Vill. of Hinsdale*, No. 15-cv-1245, 2015 U.S. Dist. LEXIS 88341, at *6–7 (N.D. Ill. July 7, 2015) (noting that the "Seventh Circuit has not directly addressed the issue, but appears to focus more on whether the state has waived *Younger* abstention, rather than timing"); *see also Knowlton v. City of Wauwatosa*, No. 20-cv-1660, 2022 U.S. Dist. LEXIS 15615, at *7–8 (E.D. Wis. Jan. 28, 2022) (citing *Kurtz* and holding that the State had

---

[2] The Court thanks Judge James Hauser for providing the Court with critical information.
[3] Similarly, the Court thanks State's Attorney Carl Larson for providing information, allowing this Court to proceed.

waived its *Younger* argument by first seeking a stay in the municipal proceedings). So, the Court will not abstain.

## II.    Facts

The facts recited here are derived from the parties' Local Rule 56.1 statements of undisputed fact and, when necessary, from an analysis of the videos in the record.[4] Shaquille Dukes has suffered with asthma for most of his life. On June 8 and 9, 2019, Dukes was a patient at FHN Memorial Hospital in Freeport, Illinois, where he was treated for double pneumonia, acute bronchitis, and asthma exacerbation. Dukes had been released on June 8, but he returned by ambulance on June 9, and was accompanied by Co-Plaintiffs Marqwandrick Morrison and Credale Miles. After spending a few hours in the emergency department, Dukes was admitted to FHN Memorial Hospital and placed in the telemetry unit on the fourth floor, where emergency department patients are often assigned. Though that unit

---

[4] Like so many summary judgment motions, bitter fights broke out regarding the Local Rule 56.1 statement of facts. For example, Plaintiffs contended that the Hospital Defendants violated Local Rule 56.1 by including at least 300 statements of fact even though the limit is 80. *See* Local Rule 56.1(d)(5). Plaintiffs' argument that the Hospital Defendants exceeded their authorized number of statements relies on the contention that multiple statements of fact are nested within a single purported statement of fact. They gave this as an example. According to Plaintiffs, the following statement contained at least five fact statements: "Dukes did not suffer a seizure or a stroke, despite the allegation that '[w]hile handcuffed in the back of the squad car, Plaintiff Dukes suffered a medical emergency of an asthma attack, seizure, stroke, and blacked out for approximately 2 minutes.'" Dkt. 66-3, ¶ 66. That is an unreasonable interpretation. Plaintiffs are effectively searching for every fact possible in a single sentence and adding them up. The Court declines to unreasonably interpret the Hospital Defendants' seventy-four statements of fact as "at least 300" statements or to deny summary judgment on that ground. Here's another example. The Hospital Defendants cited medical records to establish that despite the complaint's allegation that Dukes suffered a stroke, Dukes did *not* suffer a stroke. Plaintiffs refused to simply admit this fact and instead demurred because Dukes is not a doctor. Dkt. 66-3, at 28–29.

has the technology to remotely monitor its patients, Dukes was not connected to a monitor because he was an overflow patient.

Dukes was given intravenous ("IV") saline fluids. The IV fluid bag was suspended on the top of an approximately six-foot medical pole, which was equipped with a pump and a monitor. Because the IV pole was on wheels, Dukes was able to walk with the IV attached to his arm by needle. So, Dukes, Miles, and Morrison decided to go for a walk outside, as they had done earlier in the day. They are adamant that the walk was sanctioned by the medical team. But the medical team says that no such authorization occurred, nor would it ever occur, and that walks are almost always (or maybe always) restricted to the floor on which the patient is assigned. Nonetheless, Dukes, Miles, and Morrison left the fourth floor, played a piano in the lobby, and then left the hospital to walk around the parking lot. But during this walk, they were stopped by Defendant Ryan Godsil, who was a security guard at the hospital.

Godsil understood that patients were not permitted to leave the hospital, and thought Dukes, Miles, and Morrison were attempting to steal hospital equipment, even though the IV was attached to Dukes' arm and administering fluids at the time.[5]

---

[5] The parties disagree whether Godsil accused Plaintiffs of attempting to steal the IV equipment. But even though the video of the initial encounter is somewhat distorted because of music being played in the background, Godsil can be heard explaining that the IV pump and pole are hospital property and needed to go back. Furthermore, Sergeant Zalaznik's body camera footage shows him detaining Dukes for attempted theft. Zalaznik later decided that attempted theft was not an appropriate charge after speaking with the security guards. Additionally, Officer Moore's body camera footage from when he first arrived on scene shows Godsil giving him a quick briefing of the situation. In that video,

So, Godsil confronted them about the suspected theft.[6] Plaintiffs found Godsil to be rude, abrasive, and essentially unprofessional. Godsil doesn't appear to have radioed the medical team to see if Dukes was allowed to walk around the block, but he was expected to approach any patients found outside and ensure they returned to the hospital. Plaintiffs took issue with Godsil's suspicions that they were stealing the IV. In Plaintiffs' minds, no reasonable security guard would think they would steal a device attached by needle to one of their arms. So, the situation unfortunately devolved. Voices were raised, curse words were exchanged, and because the situation was three on one, Godsil apparently felt threatened and radioed his fellow security guard, LeDarius Stewart, to call the police.[7] Stewart testified that when Godsil radioed him, he could hear yelling and obscene screaming in the background.

Once on the chaotic scene, the police officers began questioning Plaintiffs and the security guards. Officer Moore explained to Plaintiffs that the guards are tasked with protecting hospital equipment. Miles responded multiple times that there was

---

Godsil tells Officer Moore that Plaintiffs were off hospital grounds with the IV equipment and that it amounted to stealing hospital property. Godsil is heard explaining, "I don't care if they were coming back, that's stealing." Officer Dan Moore, Body Camera Footage, at 0:25 to 0:32 seconds. Godsil's statement evidences a fundamental misunderstanding of Illinois law regarding theft, which requires the intent to permanently deprive the owner of the property. 720 ILCS 5/16-1(a)(5)(A), (B), (C); 720 ILCS 5/15-3; Illinois Pattern Jury Instructions (Criminal) 13.00 (requiring the government to prove permanent deprivation of the property). Regardless, it cannot be reasonably disputed that Godsil accused Plaintiffs of stealing hospital equipment.

[6] Among other things, hospital security guards are tasked with patrolling hospital grounds, checking the security of doors, intervening with problematic patients or visitors, and responding to other types of security calls as necessary.

[7] Though hospital security guards are equipped with a taser, handcuffs, and a radio, Godsil does not appear to have taken out or attempted to use his taser or his handcuffs at any time.

7

no threat, and Dukes continued telling the officers that they were authorized to go for a walk and were clearly not stealing anything. Officer Moore told Miles that he was creating a scene by talking over the others and raising his voice. Moore then told Miles to stop talking and that he wouldn't ask him again. Miles responded, "What the fuck is you talking about?" Moore then physically grabbed Miles, put him in handcuffs, and placed him in the back of the police car.

Officer Fidecki attempted to de-escalate the situation by talking Dukes into returning to the hospital. But that attempt went out the window when Plaintiffs were told that Miles and Morrison were not welcome back inside. Dukes may have interpreted that to mean none of the three were welcome back, and is heard on video saying, "he said we're not there." Officer Fidecki again asked Dukes to return to the hospital, but this time Dukes responded that he was told they were not allowed to go back. This can be heard between the fifth and sixth minutes of Officer Fidecki's body camera footage. Regardless, Dukes began attempting to remove the IV himself and refusing to go back to the hospital.[8]

At that point, the nursing supervisor arrived on scene. Dukes informed the nursing supervisor that he was authorized to go for a walk, as he already stated. At the same time, Officer Fidecki confirmed with Godsil that Dukes was allowed to go back to the hospital—that only Miles and Morrison were not welcome back. The nursing supervisor can be heard telling Dukes that he could come back to the hospital. But Dukes refused and explained that he wanted the IV taken out

---

[8] Plaintiffs didn't sue Fidecki and don't contend he did anything wrong.

immediately. Dukes later explained that he chose not to go back to the hospital because he did not want to leave Miles and Morrison on the scene alone.

Sergeant Zalaznik then arrived on scene, joining Dukes, Miles, Morrison, Godsil, Stewart, Moore, Fidecki, and the nursing supervisor. Officer Fidecki briefed him on the situation and told him that Miles and Morrison were not allowed back at the hospital. Zalaznik recognized Miles in the back of the police car and explained that Miles just wanted to argue and that they had dealt with Miles recently in another situation. A nurse then arrived and took the IV out of Dukes' arm. On Sergeant Zalaznik's orders, Officer Fidecki approached Morrison to obtain his full name. Morrison refused to cooperate and continued arguing about the situation. Officer Fidecki then escorted Miles to jail. On the body camera footage, Miles can be heard cursing and yelling at Fidecki during the ride to the jail. Later, when he was sitting in the back of the squad car at the jail intake facility, Miles continued to yell and curse. He became especially belligerent when Officer Moore arrived at the jail.

Back at the scene, Morrison was told multiple times that he was free to leave, but instead he stayed and continued to argue with police officers. Police eventually arrested him, to which he did not take kindly. At first, he tried to avoid the officers' hands while they attempted to place him in handcuffs,[9] but he then accepted the arrest, though he continued to verbally contend that he was not resisting while accusing the officers of racism. Later, Officer Moore explained to him that he was arrested for resisting because while the officers were trying to assess the scene, the

---

[9] There is no right to resist even an unlawful arrest. *Chelios v. Heavener*, 520 F.3d 678, 688 (7th Cir. 2008).

three kept interfering, talking over them, and generally preventing the investigation from unfolding.

Sergeant Zalaznik then told Dukes that he was not free to leave and cuffed him. Zalaznik can be heard on video telling Dukes he was under arrest for attempted theft. Officer Holden then walked Dukes to the police car, searched his pockets, and removed Dukes' inhaler. He then began driving Dukes away. During the drive, the two spoke to each other until Dukes became quiet. At some point, he stopped the car and saw that Dukes was having a medical emergency in the back seat. (This appears to have happened at the police department, which is where Officer Holden told Dukes they were going.) He immediately asked Dukes if he was having a seizure. Holden quickly opened the back door and radioed for help. The video shows Dukes shaking and struggling to breathe. The video also shows him calling out that he couldn't breathe and that he needed help. Two other officers then arrived, and Dukes continued to exclaim that he could not breathe. Although Officer Holden had previously taken Dukes' inhaler away, he did not immediately return it. Dukes appeared to recover somewhat without the inhaler, but his symptoms persisted. At that point, Officer Hilby attempted to render aid and Dukes told her that he needed his inhaler. Hilby then asked Officer Holden if he had the inhaler, and Holden retrieved it from the front seat. After a couple of minutes, the paramedics arrived and took Dukes back to the hospital.

### III.    Analysis

On summary judgment, the movant has the burden of showing that "no genuine dispute as to any material fact" exists and that it is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those that might affect the outcome of the suit. *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248 (1986). No "genuine" dispute exists if a court would be required to grant a Rule 50 motion at trial. *Id.* at 250–51. The Court must construe the "evidence and all reasonable inferences in favor of the party against whom the motion under consideration is made." *Rickher v. Home Depot, Inc.*, 535 F.3d 661, 664 (7th Cir. 2008). "Summary judgment is only warranted if, after doing so, [the Court] determine[s] that no jury could reasonably find in the nonmoving party's favor." *Blasius v. Angel Auto, Inc.*, 839 F.3d 639, 644 (7th Cir. 2016). Video evidence is particularly relevant to this case because the vast majority of the events in question can be seen through the video evidence in the record—police officer body camera footage, hospital security footage, and a cell phone video. When presented with video evidence that clearly contradicts the nonmovant's claims, federal courts "may consider that video footage without favoring the nonmovant." *Horton v. Pobjecky*, 883 F.3d 941, 944 (7th Cir. 2018) ("When video footage firmly settles a factual issue, there is no genuine dispute about it, and we will not indulge stories clearly contradicted by the footage.").

### A.  City of Freeport Defendants

All Plaintiffs allege claims of false arrest and violations of equal protection

against the City Defendants, and a *Monell* claim and a "willful and wanton conduct claim" against the City of Freeport.[10] Dukes also alleges claims of failure to provide medical treatment and a violation of his substantive due process rights.

### 1. False Arrest—Fourth Amendment

Plaintiffs first bring a claim against the City Defendants under 42 U.S.C. §1983 for false arrest in violation of their constitutional rights. Dukes alleges that he was racially profiled, harassed, discriminated against, and eventually arrested without probable cause "for simply taking a walk outside the hospital" where he was a patient. Dkt 1, ¶¶ 84–85. Miles and Morrison similarly bring claims under §1983 for being arrested for "disorderly conduct, resisting arrest, and obstructing a peace officer, without probable cause." *Id.* ¶¶ 190, 219. (Notwithstanding Dukes' framing of the issue, he undisputedly was also arrested for disorderly conduct.) The City Defendants move for summary judgment on Plaintiffs' false arrest claims on two grounds. First, they contend that probable cause existed for the arrests. Second, they contend that even if probable cause did not exist, the individual City Defendants are entitled to qualified immunity.

The existence of probable cause is an absolute defense to a false arrest claim under the Fourth Amendment. *Ewell v. Toney*, 853 F.3d 911, 919 (7th Cir. 2017). Probable cause is measured at the time of arrest based on the facts and

---

[10] Plaintiffs complain that the City Defendants exceeded their 15-page maximum. In response, the City Defendants seek leave of Court after the fact to file a brief in excess of the maximum page number. Because Plaintiffs bring numerous claims against multiple defendants, the extra pages are reasonable, and the Court excuses the City Defendants' error.

circumstances known to the arresting officer. *Id.* If those facts and circumstances are sufficient to allow a prudent person of reasonable caution to believe "the suspect has committed, is committing, or is about to commit an offense," then the officer had probable cause to arrest the plaintiff, and that arrest "was not false." *Id.* (quoting *Williams v. City of Chicago*, 733 F.3d 749, 756 (7th Cir. 2013)). "A court evaluates probable cause not with the benefit of hindsight, and not on the facts as perceived by an omniscient observer, but on the facts as they appeared to a reasonable person in the defendant's position, even if that reasonable belief turned out to be incorrect." *Stokes v. Bd. of Educ.*, 599 F.3d 617, 622 (7th Cir. 2010). Furthermore, the probable cause inquiry deals in probabilities, not technicalities, and courts must consider the totality of circumstances within the knowledge of the team of officers at the time of arrest. *Illinois v. Gates*, 462 U.S. 213, 231 (1983); *Bergquist v. Milazzo*, No. 18-cv-3619, 2021 U.S. Dist. LEXIS 184852, at *16–17 (N.D. Ill. Sept. 28, 2021).

Plaintiffs' response asserts multiple grounds upon which they contend that a reasonable jury could find that the City Defendants lacked probable cause to arrest them. *E.g.*, Dkt. 67-2, at 7. Probable cause, however, is a mixed question of law and fact. *Smith v. Lamz*, 321 F.3d 680, 684 (7th Cir. 2003); *Humphrey v. Staszak*, 148 F.3d 719, 725 (7th Cir. 1998). The jury is responsible for determining the facts, but whether those facts constitute probable cause is a question of law for the Court. And if the facts are undisputed, then probable cause is purely a question of law. *United States v. Ellis*, 499 F.3d 686, 688 (7th Cir. 2007); *Cervantes v. Jones*, 188 F.3d 805, 811 (7th Cir. 1999). In this case, the facts necessary to resolve the question of

13

probable cause are not reasonably in doubt. They are recorded, both on audio and video.

The City Defendants focus on the time before the police arrived, when Godsil approached Plaintiffs and accused them of stealing. A review of Sergeant Zalaznik's deposition explains why. He testified that the basis for charging Plaintiffs with disorderly conduct was their behavior upon being approached by Godsil:

> [I]t was when he first approached all three of them about them being off of FHN property with the IV and the IV pump. And he said that they all got - - approached him in an aggressive manner yelling and he felt threatened and he said he was alarmed and disturbed by their actions. And based on everything else that I had seen when I arrived, and it seemed like there was enough probable cause for the fact that they committed disorderly conduct.

Dkt. 67-7, at 4. Zalaznik believed this because of what Godsil told him and what he and his fellow officers had personally witnessed. And although the video evidence does not fully capture that moment, the video fully captures what information was available to the officers.

Regarding the charge of resisting and obstructing a peace officer, Officer Moore testified that the basis of Miles' arrest was his "shouting over me and causing a disturbance" and "beginning to obstruct my ability to conduct my investigation." Dkt. 67-8, at 2. The basis Moore gave for Morrison's arrest was essentially the same as Miles' arrest; namely, for "continuing to talk over officers and not leaving the area when we said he was no longer welcome on the property." Dkt. 67-8, at 4. Additionally, Moore testified that Plaintiffs were known to police:

> It had been brought up at the beginning of shift one day that this person, Shaquille Dukes[,] was in town and pretty much instructed just to - - we

were told that he liked to argue with police and we were told that if we come into contact with him to not get into argument with him and not try to make the situation . . . Basically to avoid situations like this.

Dkt. 67-8, at 6–7. Moore explained that Dukes was described as someone that "liked to make it known that he was aware of the laws and would try to provoke a reaction from police." *Id.* at 8–9.

It is irrelevant that Dukes was originally arrested for attempted theft. The Supreme Court expressly rejected a rule that required the conduct establishing probable cause to be closely related, and based on, the same conduct identified by the arresting officer during the arrest. *See Devenpeck v. Alford*, 543 U.S. 146, 153, 154-155 (2004) ("Subjective intent of the arresting office, *however* it is determined . . . is simply no basis for invalidating an arrest." (emphasis in original)). All three Plaintiffs were charged with disorderly conduct. Miles and Morrison were additionally charged with resisting and obstructing a peace officer. Dkt. 84. But the offense each Plaintiff was charged with or not charged with is irrelevant. There need only be probable cause to arrest for *any* crime. *Holmes v. Village of Hoffman Estates*, 511 F.3d 673, 682 (7th Cir. 2007) ("[P]robable cause to believe that a person has committed *any* crime will preclude a false arrest claim, even if the person was arrested on additional or different charges for which there was no probable cause. . .") (emphasis in original). Because there was probable cause to arrest the Plaintiffs for disorderly conduct, the Court will only discuss that offense.

i.    Disorderly Conduct

All three Plaintiffs were charged with disorderly conduct. "A police officer's probable cause determination depends on the elements of the applicable criminal statute." *Stokes*, 599 F.3d at 622. Illinois broadly defines disorderly conduct: "A person commits disorderly conduct when he or she knowingly . . . [d]oes any act in such unreasonable manner as to alarm or disturb another and to provoke a breach of the peace." 720 ILCS 5/26-1.

In this case, the City Defendants had probable cause to arrest Plaintiffs for disorderly conduct— for doing an act in an "unreasonable manner as to alarm or disturb another and to provoke a breach of the peace." *Id.* As noted previously, Plaintiffs' disorderly conduct arrests were based on their conduct before the officers arrived on scene. Although some of the events that took place before the officers arrived are in dispute, what the officers knew about those events is not.  Body camera footage supplies the record with video evidence of the totality of the circumstances known to the officers at the time of arrests. Because the information known to the officers is not reasonably in dispute, the Court can resolve the probable cause inquiry as a matter of law. *Ellis*, 499 F.3d at 688 (explaining that when the facts are not in dispute, the probable cause inquiry is a question of law); *Cervantes*, 188 F.3d at 811 (same).

And though the arresting officers were not on scene during the period giving rise to the disorderly conduct charge, arresting officers do not need to have personally witnessed the events giving rise to probable cause, as long as the victim

or "a reasonably credible witness" informed the officer of what happened. *Gower v. Vercler*, 377 F.3d 661, 668–69 (7th Cir. 2004).

Here, Godsil witnessed the events and conveyed his observations to the individual City Defendants, including that Plaintiffs aggressively approached him, surrounded him in a semi-circle, and berated and yelled at him for questioning them. Although a jury might choose not to believe his testimony in the underlying criminal case, all that matters for a probable cause determination in this Court is that the arresting officers relied on him and believed him to be a credible witness, based on the facts and circumstances available to them including that his co-worker Stewart heard the argument over the radio. Based on the totality of the circumstances, they reasonably credited Godsil and Stewart's version of events over Plaintiffs'. *Dewar v. Chicago Police Dep't*, No. 16-cv-2287, 2019 U.S. Dist. LEXIS 7578, at *8–9 (N.D. Ill. Jan. 16, 2019) ("A single witness or putative victim's complaint generally suffices to establish probable cause so long as the complaint would not lead a reasonable officer to be suspicious."). Again, that determination was made based on what the officers witnessed and their prior knowledge of Plaintiffs. *Reher v. Vivo*, 656 F.3d 772, 776–77 (7th Cir. 2011) (relying in part on the "long history of domestic disputes" between the two individuals and crediting the officer's knowledge of that "turbulent history"); *Gower*, 337 F.3d at 669 (officers considered plaintiff's conduct from the previous night); *United States v. Olson*, 408 F.3d 366, 372 (7th Cir. 2005) (explaining that a criminal record check for past conduct wasn't enough to corroborate a confidential information probable cause

testimony, but it does "retain some corroborative value" because the analysis relies on the totality of the circumstances).[11] Based on that evidence alone, the officers had probable cause to believe Plaintiffs were causing public disorder.

The Court states no opinion on whether Plaintiffs are guilty of disorderly conduct. Indeed, the individual City Defendants may have been wrong but that is irrelevant. *See* Xing *Qian v. Kautz*, 168 F.3d 949, 953 (7th Cir. 1999) (probable cause does not require an officer's belief to be correct or even more likely than false; it need only be reasonable). The Court's narrow holding is merely that the totality of circumstances within the officers' knowledge at the time of arrests gave them probable cause to arrest Plaintiffs for disorderly conduct.

Other cases have reached similar conclusions. In *Whitney v. Ne. Ill. Reg'l Commuter R.R. Corp.*, No. 15-cv-2166, 2019 U.S. Dist. LEXIS 7582, at *18–19 (N.D. Ill. Jan. 16, 2019), a court in this district held that officers had probable cause to arrest a train passenger that had become upset after having to wait over forty minutes for another train to arrive. It ended up being the same train she had

---

[11] *See also United States v. Cardoza*, 713 F.3d 656, 660 (D.C. Cir. 2013) (including in the list of circumstances relevant to probable cause that Cardoza had a history of drug arrests); *Radvansky v. City of Olmsted Falls*, 395 F.3d 291, 310 (6th Cir. 2005) (including the officer's prior knowledge as a reason that probable cause did not exist); *United States v. Maldonado*, 735 F.2d 809, 815 (5th Cir. 1984) (affirming the district court's probable cause determination based on the officer's "prior knowledge and observations of Maldonado being involved and talking with drug traffickers, the Officer's observations of Maldonado earlier in the day in close proximity to the premises, and Maldonado's giving of a false name"); *Serrano v. United States*, 766 F. App'x 561, 567 (10th Cir. 2019) (holding that probable cause to believe a threat of physical harm to the deputies existed because, in part, the deputy in question "knew that Serrano had a history of fleeing from and opposing law enforcement officers, and he had been informed that Serrano would flee if faced with returning to prison").

previously been on, so she confronted the conductor. He testified that she asked for, and he gave her, information on how to contact customer service, but then she later "joined him in the vestibule area, 'tak[ing] steps toward him' and 'making derogatory statements.'" *Id.* at \*4. The officers also claimed that Whitney was loud and disruptive when they arrived, and "became loud and belligerent, using profanity" toward one of the officers. *Id.* at \*7–8. In that case, the situation devolved even further, and resulted in a battery charge, but the court's determination that the officers had probable cause for disorderly conduct was based on the conductor's statement and video evidence showing that Whitney became upset, "gesticulating and pointing her finger at the officers on the platform." *Id.* at 18–19.

In *Allen v. City of Des Plaines*, 262 F. Supp. 3d 727 (N.D. Ill. 2017), a court also held that officers had probable cause to arrest Allen for disorderly conduct after learning that he had caused a disturbance, had been throwing food, and refused to leave the McDonald's drive-thru causing other customers to be stuck in line. *Id.* at 731. In *Bennett v. Vill. of Park Forest*, the arresting officer had probable cause to arrest the plaintiff for disorderly conduct because a witness reported that the plaintiff had yelled and cursed at him, threatened ongoing harassment, and refused to leave the witness's property. 2018 U.S. Dist. LEXIS 131430, at \*7 (N.D. Ill. Aug. 7, 2018).

Plaintiffs respond by citing *People v. Bradshaw*, 452 N.E.2d 141 (Ill. App. Ct. 1983) and *People v. Justus*, 372 N.E.2d 1115 (Ill. App. Ct. 1978) for the proposition that Illinois' disorderly conduct statute does not prohibit vulgar language or loud

and offensive argumentation with police officers. Dkt. 67-2, at 5. In *Bradshaw*, a bar patron called a bartender "all kinds of obscene names for ten to fifteen minutes" and didn't leave the bar until he saw the bartender calling the police. 452 N.E.2d at 142. In that case, the court explained that the behavior was nothing more than annoying, as evidenced by the lack threats or any customers leaving the bar. *Id.* In other words, behavior that is "merely annoying" is not enough to establish probable cause for a disorderly conduct charge. *Id.* And in *Justus*, the court explained that "abusive language does not evolve into a crime simply because persons nearby stop, look and listen." 372 N.E.2d at 1118. But that court also noted that "arguing with a police officer is one factor to be considered." *Id.* at 1117.

Although mere speech alone might not be enough, yelling and cursing accompanied by additional suspicious or harassing behavior may be enough to create probable cause. *Thayer v. Chiczewski*, 697 F.3d 514, 526 (7th Cir. 2012); *Reher v. Vivo*, 656 F.3d 772, 776 (7th Cir. 2011) ("Illinois courts have time and again held that arguing with a police officer, even if done loudly, or with profane or offensive language, will not in and of itself constitute disorderly conduct."). Although a person's action must actually breach the peace, *Peters v. City of Palatine*, No. 16-cv-11703, 2019 U.S. Dist. LEXIS 26547, at 6 (N.D. Ill. Feb. 20, 2019), the "breach-of-the-peace element" of disorderly conduct "requires nothing more than the unreasonable harassment of a single person, even in a nonpublic location." *Maniscalco v. Simon*, 712 F.3d 1139, 1144 (7th Cir. 2013).

The Seventh Circuit's recent decision in *Gaddis v. Demattei*, No. 20-2424, 2022 U.S. App. LEXIS 8768 (7th Cir. April 1, 2022) further illustrates why Plaintiffs' claim must fail. In that case, Gaddis cut down portions of a neighbor's tree because the branches were extending into his yard. He then threw the trimmings back into the neighbor's yard, and the trouble ensued. *Id.* at *2–3. He was eventually arrested for disorderly conduct after he approached the home of another neighbor in an aggressive manner. One witness claimed Gaddis banged on the door aggressively and exclaimed, "You want to go old man?" *Id.* at *4. Another witness' account was similar but more subdued. He stated that Gaddis knocked on the neighbor's door (the neighbor was carrying a rake) and repeatedly said "come on, come on." *Id.* On appeal, the Seventh Circuit held that Gaddis' false arrest claim failed because the officers had probable cause to arrest him for disorderly conduct. Though mere words may not be enough, the court explained that the totality of the circumstances made it reasonable for officers to believe that Gaddis's behavior had "alarmed or disturbed others as described in the Illinois disorderly conduct statute." *Id.* at *10. In this case, the individual City Defendants were reasonable in crediting Godsil's and Stewart's statements and concluding that Plaintiffs' conduct was aggressive and "alarmed or disturbed" Godsil.

Thus, the City Defendants had probable cause to arrest Plaintiffs for disorderly conduct, and so the arrests were not "false."[12]

---

[12] Though Miles and Morrison were also arrested for resisting and obstructing a peace officer, neither Plaintiffs nor the City Defendants have developed any meaningful arguments regarding whether probable cause existed to arrest Miles or Morrison for those offenses. So, the Court does not rest its opinion on whether probable cause existed for those

ii.    Qualified Immunity

In the alternative, the individual City Defendants contend they are entitled to summary judgment based on qualified immunity. Law enforcement "officers are entitled to qualified immunity under §1983 unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was 'clearly established at the time.'" *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)). For the unlawfulness of conduct, and thus the existence of a right, to be clearly established, it must be "'sufficiently clear' that every 'reasonable official would understand that what he is doing' is unlawful.'" *Id.* (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2014)). In other words, then-existing precedent must have rendered the question settled, so that it is "beyond debate." *Id.* at 589–90.

In the false arrest context, an "officer who makes an arrest is entitled to qualified immunity if 'a reasonable officer could have believed [the] arrest to be lawful, in light of clearly established law and the information the arresting officers possessed.'" *Taylor v. Hughes*, 26 F.4th 419, 433–34 (7th Cir. 2022). Stated differently, the existence of "arguable probable cause" means that the officer is immune from liability because the unlawfulness of the officer's action is not beyond debate. *Id.* at 432; *Muhammad v. Pearson*, 900 F.3d 898, 908 (7th Cir. 2018). As a result, a mistaken belief of probable cause is still immune if the subjective belief of probable cause was objectively reasonable. *D.Z. v. Buell*, 796 F.3d 749, 755 (7th Cir.

---

charges, nor does it need to. *Holmes*, 511 F.3d at 682 (probable cause for *any* offense bars all false arrest claims).

22

2015).

As detailed above, the Court has already concluded as a matter of law that, based on the undisputed facts, the individual City Defendants had probable cause to arrest the Plaintiffs for disorderly conduct. Accordingly, the officers are also entitled to qualified immunity. *Taylor*, 26 F.4th at 433.

The City Defendants invoke qualified immunity for the individual City Defendants. They assert that the officers were called to the scene by local hospital staff, that emotions were running high, and that they were tasked with making on-scene judgment calls. Dkt. 59, at 13. Plaintiffs respond that the issue should be determined by a jury and that the City Defendants' brief makes impermissible credibility determinations. Dkt. 67-2, at 4. They further contend that the officers' lacked probable cause to arrest Plaintiffs. *Id.* at 4–5. But Plaintiffs' argument misses the mark for two reasons: (1) they confuse the probable cause standard; and (2) their argument fails to understand the difference between probable cause and arguable probable cause, which is vital to qualified immunity.

First, as noted previously, probable cause is a mixed question of law and fact. *Smith v. Lamz*, 321 F.3d 680, 684 (7th Cir. 2003); *Humphrey v. Staszak*, 148 F.3d 719, 725 (7th Cir. 1998). The determination of whether arguable probable cause existed, however, is purely a question of law. *Cibulka v. City of Madison*, 992 F.3d 633, 639 n.2 (7th Cir. 2021) ("Todd argues that whether there was probable cause is a question of fact for the jury. But whether arguable probable cause supports qualified immunity 'is a pure question of law' to be decided by the court." (quoting

*Thayer v. Chiczewski*, 705 F.3d 237, 247 (7th Cir. 2012))). In this case, the Court has determined that the facts needed to determine probable cause are not reasonably disputed, and so the question is for the Court. But regardless, the question of whether arguable probable cause existed is always a question of law for the Court to decide. The officers undoubtedly had arguable probable cause to arrest Plaintiffs for disorderly conduct.

The Illinois disorderly conduct statute is imprecise and broad: "A person commits disorderly conduct when he or she knowingly . . . [d]oes any act in such unreasonable manner as to alarm or disturb another and to provoke a breach of the peace." 720 ILCS 5/26-1. And although Plaintiffs' yelling and cursing alone might not afford the officers probable cause to arrest them for disorderly conduct, that sort of conduct in conjunction with other alarming conduct is enough to constitute probable cause. *Thayer*, 705 F.3d at 249. "Disorderly conduct is loosely defined. As a highly fact-specific inquiry, it 'embraces a wide variety of conduct serving to destroy or menace the public order and tranquility.'" *People v. Eyler*, 2019 IL App. (4th) 170064, ¶ 22 (quoting *People v. McLennon*, 2011 IL App. (2d) 091299, ¶ 31). But, in some instances, mere speech alone can be enough to disturb the public. *Id.* ¶¶ 67–68 (Cavanagh, J., concurring). The loose nature of the offense may explain why arguable probable cause has been repeatedly found so as to provide qualified immunity. *See, e.g., Thayer*, 705 F.3d at 247 (qualified immunity protects officers who reasonably interpret an unclear statute); *Humphrey*, 148 F.3d at 728. The loose nature of the statute and various courts' struggles to define its scope also

24

support the defense of qualified immunity. *Compare Biddle v. Martin*, 992 F.2d 673, 67 (7h Cir. 1993) (finding that arguing with a police officer can be disorderly conduct under Illinois law) *with People v. Douglas*, 331 N.E.2d 359, 363 (Ill. App. Ct. 1975) ("Arguing with a police officer, even if done loudly, will not of itself constitute a violation of this section.").

Setting aside Plaintiffs' argumentative confrontation with the officers, probable cause was established by the reported actions of Plaintiffs before the police arrived. As further explained previously, the officers were entitled to rely on the witness statement of Ryan Godsil, who explained that Plaintiffs approached him in an aggressive manner. They were further allowed, and required, to consider the totality of the information available to them. They considered their impression of Plaintiffs' demeanor, and their knowledge of Plaintiffs. And Godsil's statement was corroborated by his co-worker LeDarius Stewart, who could hear Plaintiffs yelling over the radio.

Under these facts, even if the officers did not have probable cause to arrest Plaintiffs for disorderly conduct, they at least had arguable probable cause. Arguable probable cause means only that "a reasonable officer in the same circumstances and with the same knowledge and possessing the same knowledge as the officer in question *could* have reasonably believed that probable cause existed in light of well-established law." *Fleming v. Livingston Cnty.*, 674 F.3d 874, 880 (7th Cir. 2012) (quoting *Humphrey v. Staszak*, 148 F.3d 719, 725 (7th Cir. 1998) (emphasis in original)). Because a reasonable officer *could* have believed Godsil's

statements that Plaintiffs were acting aggressively, and thus were more than merely speaking and arguing, the individual City Defendants had at least arguable probable cause to arrest Plaintiffs for disorderly conduct, so the question of probable cause was not "beyond debate." Qualified immunity provides the individual City Defendants with an alternative basis for summary judgment on this claim.

### 2. Equal Protection

Plaintiffs next claim the City Defendants violated their right to equal protection of the law, as guaranteed by the Fourteenth Amendment. In support of their motion for summary judgment, the City Defendants argue that they provided Plaintiffs "with a printout of arrests at or near FHN Hospital." Dkt. 59, at 13. They further contend that Plaintiffs have not elicited further data and have not disclosed any additional data sufficient to establish a claim that the City Defendants selectively and discriminatorily enforced the law. *Id.* at 13–14. In response, Plaintiffs argue that they do not need statistical analysis because their claim rests on the individual City Defendants' decision to arrest Plaintiffs but not Defendant Godsil. Dkt. 67-2, at 10–12.

In *Whren v. United States*, the Supreme Court explained that "the Constitution prohibits selective enforcement of the law based on considerations such as race. But the constitutional basis for objecting to intentionally discriminatory application of laws is the Equal Protection Clause, not the Fourth Amendment." 517 U.S. 806, 813 (1996). "Racially selective law enforcement is a quintessential equal protection violation." *Conley v. United States*, 5 F.4th 781, 788 (7th Cir. 2021). But

26

to establish that the police engaged in selective enforcement, the plaintiffs must establish that the defendants' "actions had a discriminatory effect and were motivated by a discriminatory purpose." *Id.* at 789 (quoting *Chavez v. Illinois State Police*, 251 F.3d 612, 635–36 (7th Cir. 2001)). To establish a discriminatory effect, plaintiffs must show that they are members of a protected class, are similarly situated to persons that are not members of a protected class, and that they were treated differently than those persons. *Chavez*, 251 F.3d at 636. Discriminatory purpose is a subjective inquiry that implies more than "intent as awareness" of a discriminatory effect. *Id.* at 645. Rather, the discriminatory motive requires a showing that the decisionmaker "selected or reaffirmed a particular course of action at least in part 'because of' . . . its adverse effects upon an identifiable group." *Id.* (quoting *McClesky v. Kemp*, 481 U.S. 279, 298 (1987)). Unlike selective prosecution claims, plaintiffs bringing selective enforcement claims need only meet the preponderance of the evidence standard of proof. *Id.* at 789 ("We disagree, however, and hold that racially selective-enforcement claims must be proven by a preponderance of the evidence.").

In this case, Plaintiffs' equal protection claim must fail because, after the aid of discovery, they have failed to present any evidence that the City Defendants failed to arrest similarly situated individuals outside their protected class. First, the individual City Defendants did not "select" anyone. *See United States v. Armstrong*, 517 U.S. 456, 469 (1996) (selection required for equal protection claim); *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979). They were called to the scene by

27

Defendant Godsil because of Godsil's interactions with Plaintiffs. And there's no evidence in the record that they were ever asked to arrest Godsil for any crime. Plaintiffs argue that Godsil was not arrested even though they believe he behaved in the same way as they did. But again, they have not produced any evidence that they ever requested the police to arrest Godsil.

In support of their equal protection claim, Plaintiffs primarily rely on three cases. None are persuasive. They cite *Parada v. Anoka County*, 332 F. Supp. 3d 1229 (D. Minn. 2018), *Patterson v. McLean Cty. Sheriff's Dept*, No. 1:20-cv-01073, 2021 U.S. Dist. LEXIS 109936 (C.D. Ill. June 11, 2021), and *Vázquez v. Bensenville*, 22 F. Supp. 3d 861 (N.D. Ill. 2014). All three of those cases involved motions to dismiss, rather than for summary judgment, and so those courts were merely asked to determine whether plaintiffs had stated a claim. They are not helpful on a motion for summary judgment. Nonetheless, the factual allegations present in those cases do not help Plaintiffs.

In *Parada*, the plaintiff alleged she was arrested for a driving offense although the officer had not arrested at least six other individuals in the prior year when they had committed driving offenses. 332 F. Supp. 3d at 1244–45. That scenario has no factual similarity here.[13] In *Patterson*, the plaintiff stated a claim

---

[13] Of the three cases cited by Plaintiffs, only *Parada* appears to have eventually gone to summary judgment. *Parada v. Anoka Cty.*, 481 F. Supp. 3d 888 (D. Minn. 2020). In that case, the officer arrested Parada for driving without a license. *Id.* at 894. The officer stated that he was worried she would not appear and that she may be using a fake identification (it was a consular identification from Mexico). *Id.* at 893–94. But then Parada's stepfather arrived on scene and identified his daughter. The officer was able to verify his driver's license and match its address to the one on Parada's consular identification. *Id.* at 894. On summary judgment, Parada presented this evidence as well as the proof of insurance

28

after he was arrested for possessing a firearm because he had two White friends who had equal access to the premises, shared the same connection to the firearm, and they had admitted the firearm was in their residence. 2021 U.S. Dist. LEXIS 109936, at \*16–17. In that case, the three individuals were questioned as a group but the police selected only the plaintiff to arrest. In this case, the police were called to investigate only Plaintiffs and there was no basis to suspect Godsil of a crime. And in *Vázquez*, the court determined that the plaintiff had sufficiently alleged an equal protection claim by asserting that the arresting officers had "enforced the law one-sidedly and [had] not been impartial and evenhanded in arbitrating the disputes between" the plaintiff and the residents. 22 F. Supp. 3d at 868. But in that case, the officers were asked to mediate between people and chose not to interview several people who allegedly could have corroborated the plaintiff's side of the story. That is very different from this case, in which the police officers were called to the scene to investigate Plaintiffs, and Plaintiffs only, and interviewed everyone available on the scene for a considerable period of time before making arrest decisions.

 Furthermore, the video demonstrates that once the police arrived, Godsil stood off to the side and had only limited involvement in the resulting events. Miles'

---

showing her stepfather owned the car and that she was cooperative during the entire ordeal. *Id.* at 899–900. She further presented evidence that the officer had exhibited racial animus toward Mexicans on his social media accounts. *Id.* at 900. In contrast, Plaintiffs in this case have not produced any evidence that comes close to that presented in *Parada*. But even on the evidence Parada produced, a subsequent jury found that "the constitutional violation did not proximately cause actual injury." *Parada v. Anoka Cty.*, No. 18-795, 2021 U.S. Dist. LEXIS 154687, at \*8 (D. Minn. Aug. 17, 2021).

and Morrison's resisting and obstructing arrests were made based on their behavior with the officers, and Godsil was undisputedly not behaving in the same way—the video establishes that. And again, the record is void of any evidence that the officers were ever asked to investigate or arrest Godsil for disorderly conduct. Godsil is simply not similarly situated to Plaintiffs, and the officers can hardly be said to have acted with intentionally discriminatory motives when they weren't even presented with the question in first place.[14]

Plaintiffs also point to Sergeant Zalaznik's instruction to his fellow officers that they shouldn't argue with Plaintiffs "because they are all alike." Dkt. 67-2, at 11. Plaintiffs imply that Zalaznik meant they were all alike because of their race. The video evidence of the event forecloses that contention. And Dukes doesn't appear to believe it was about race either. When Zalaznik appeared on the scene, he recognized Plaintiffs from prior incidents and, referring to Dukes, Zalaznik said, "We don't need to argue with him, he's just like this guy. Let's just do what we need to do."[15] Dukes then responded, "I'm not just like this guy. I know you've dealt with

---

[14] Again, even if these cases were enough to show that Plaintiffs stated a claim sufficient to warrant discovery, the argument would still fail here because this case is far beyond the pleading stage. Stating a claim is no longer enough. And the Court has been clear that litigants should "rely on cases that were decided in the same procedural posture. In memoranda supporting or opposing a motion to dismiss, cases that were decided on summary judgment (or on appeal of summary judgment) are not particularly helpful because of the differing standards. . . This applies to the inverse as well. . . As everybody hopefully learned in the first semester of law school, counsel should rely on decisions involving motions to dismiss when briefing a motion to dismiss and decisions involving summary judgment (or Rule 50) when briefing a motion for summary judgment." *See* Standing Order on Supporting Memoranda and Exhibits; *see also Lujan v. Nat'l Wildlife Fed'n.*, 497 U.S. 871, 889 (1990).

[15] Zalaznik Body Camera Footage at approximately four minutes and fifteen seconds.

him."[16] The video makes clear the everyone knew Zalaznik was referring to the argumentative nature of Plaintiffs that he had experienced in prior incidents, not their race.

The individual City Defendants were warned about Plaintiffs before the incident. They were warned that Plaintiffs were in town and had displayed a desire to provoke the police into argumentative confrontations. Zalaznik's statement was unambiguously referring to Plaintiffs' desire to argue with police officers and cause trouble generally. Regardless of whether that was Plaintiffs' actual desire, the videos demonstrate that was Zalaznik's impression of them. No reasonable jury could conclude that his statement had anything to do with anyone's race. This is supported by the absence of any references to race or derogatory racial remarks. *See, e.g., Chavez*, 251 F.3d at 646. Zalaznik was merely pointing out the futility of continuing to argue with Plaintiffs.

In the end, the only *evidence* Plaintiffs can point to is that they are African-American and Godsil is White. But just because the individuals involved are different races does not mean that the officers' choice was motivated by race. *Ford v. Wilson*, 90 F.3d 245, 248–49 (7th Cir. 1996). If that alone were enough to create a genuine dispute of fact for summary judgment, then countless police interactions could result in a trial. *Cf. Ford*, 90 F.3d at 248 (noting that "we hope that the judicially engineered expansion of constitutional law from its modest textual base has not reached the point where every one of the millions of traffic stops of speeders

---

[16] *Id.* at approximately four minutes and twenty seconds.

and other traffic offenders made every year becomes a candidate for a federal suit.").[17]

Because Godsil was not similarly situated, Plaintiffs cannot establish that the officers' actions had a discriminatory effect. Furthermore, Plaintiffs have produced no evidence that the officers' actions had a discriminatory purpose. Therefore, they cannot meet either element of their equal protection claim, so the Court grants the City Defendants' motion for summary judgment.

In their motion for summary judgment, the City Defendants incorrectly assert that Miles had not claimed a violation of equal protection. As Plaintiffs point out in response, Miles expressly brought that claim (Count XIII). Plaintiffs' complaint can be hard to follow at times. Indeed, its misnumbered claims cause unnecessary confusion. Nonetheless, the parties do not separate out their arguments on equal protection. The result as to one is the result as to all three. And Plaintiffs have responded to the City Defendants motion for summary judgment on the equal protection count as to Dukes and Morrison. Indeed, if the City Defendants had of moved for summary judgment against Miles as well, then the only difference would have been to omit the parenthetical in the brief incorrectly explaining that Miles had not brought the claim.

Though courts should be especially cautious in *sua sponte* granting summary judgment, such a decision is within the Court's discretion as long as the parties had

---

[17] Further, the practical consequences of adopting Plaintiffs' argument would be stunning. To avoid being subjected to an equal protection claim, police would not be allowed to credit one witness over another. Instead, police would need to arrest everybody at the scene.

proper notice and an opportunity to be heard. *Bradley Corp. v. Lawler Mfg. Co.*, No. 1:19-cv-01240, 2021 U.S. Dist. LEXIS 99596, at *11–12 (S.D. Ind. May 25, 2021) (quoting *Osler Inst., Inc. v. Forde*, 333 F.3d 832, 836 (7th Cir. 2003)). In this case, the parties were on clear notice that Plaintiffs' equal protection claim was in jeopardy because the City Defendants moved for summary judgment as to Morrison and Dukes. They had full opportunity to respond and be heard, and the arguments pertinent to one of them are pertinent to all of them. Indeed, Miles effectively did argue in response to the City Defendants' motion because the response brief lumps all Plaintiffs together. Dkt. 67-2, at 10 (consistently referring to Plaintiffs as a group rather than individually), 11. Thus, the Court *sua sponte* grants the City Defendants' summary judgment on Miles' equal protection claim.

### 3. *Failure to Provide Medical Treatment*

Next, the City Defendants seek summary judgment on Dukes' claim under 42 U.S.C. §1983 for failure to provide medical care. Dukes contends that the officers on scene failed to "confirm with his doctor that he was healthy enough for transport." Dkt. 67-2, at 13. Dukes further argues that Officer Moore failed to administer Dukes' inhaler quickly enough during Dukes' medical emergency in the back of the squad car. *Id.* at 14.

The video evidence establishes that Dukes was not experiencing a medical emergency on scene, when the arguments giving rise to this action occurred, though he was obviously under the care of hospital personnel. And the video evidence shows that Dukes decided against returning to the hospital after Miles and

Morrison were barred from returning and that Dukes tried multiple times to remove the IV himself. The IV was later removed by hospital personnel on scene after they requested that Dukes at least let them do that. Furthermore, the video evidence shows that Officer Holden removed Dukes' inhaler from Dukes' pocket when Holden was placing Dukes in the squad car. Holden then put the inhaler in the front of the squad car. The video evidence captures the moments when Holden realized Dukes was experiencing a medical problem. He immediately responded to the backseat to try to help Dukes. Holden did not *immediately* get the inhaler from the front seat; he did so when Officer Hilby told him to do so. Indeed, all involved appeared to think Dukes was having a seizure, rather than an asthma attack. Still, Dukes told them that he was having trouble breathing.

Dukes lumps together all the City Defendants, effectively assuming they all played an equal part in this purportedly constitutional violation, but the only defendant on scene during Dukes' medical emergency was Holden. The other two were busy with Miles and Morrison. Indeed, they can be heard on video being told over the radio about Dukes' emergency and that he was returning to the hospital. For that reason, Officer Moore and Sergeant Zalaznik cannot be found liable for any claim regarding Dukes' medical emergency in the back of the squad car because they undisputedly had no involvement in it. *Taylor*, 26 F.4th at 434–35; *Williams v. Shah*, 927 F.3d 476, 482 (7th Cir. 2019); *Colbert v. City of Chicago*, 851 F.3d 649, 657 (7th Cir. 2017).

As for Holden, the City Defendants assert that his actions during Dukes' medical emergency were not objectively unreasonable. In response, Dukes argues that the City Defendants arrested him while he was under the care of FHN Memorial Hospital, failed to consult medical personnel before taking him into custody, and failed to effectively respond after Dukes exclaimed that he couldn't breathe. Dkt. 67-2, at 11.

Challenges to the sufficiency of medical care are governed by different constitutional amendments depending on the circumstances giving rise to the litigation. If the plaintiff is an inmate serving a sentence after a conviction, then the challenge arises under the Eighth Amendment's prohibition on cruel and unusual punishment. If the plaintiff is a state pretrial detainee that, necessarily, is not yet being punished for the purported crime, then the claim is brought as an alleged violation of due process under the Fourteenth Amendment. If, as here, the plaintiff is an arrestee who has yet to receive a preliminary hearing on probable cause, then the claim is brought under the Fourth Amendment.[18] *Ortiz v. City of Chicago*, 656 F.3d 523, 530 (7th Cir. 2011); *Williams v. Rodriguez*, 509 F.3d 392, 403 (7th Cir. 2007). Dukes' claim arises under the Fourth Amendment because he was an arrestee but had yet to receive a preliminary hearing on probable cause.

---

[18] In constitutional litigation, an arrestee is a person that is held in custody by law enforcement but has yet to receive a probable cause hearing, often referred to as a *Gerstein* hearing. A detainee, on the other hand, is an individual in custody that has received a hearing on probable cause but has yet to be convicted of any crime. *Currie v. Chhabra*, 728 F.3d 626, 629 (7th Cir. 2013).

Under the Fourth Amendment, medical care is constitutionally insufficient if it was "objectively unreasonable." *Ortiz*, 656 F.3d at 530. The objective reasonableness of the defendant's conduct is measured under the totality of the circumstances. *McCann v. Ogle Cnty.*, 909 F.3d 881, 886 (7th Cir. 2018). This is determined by analyzing four factors: "(1) whether the officer ha[d] notice of the detainee's medical needs; (2) the seriousness of the medical need; (3) the scope of the requested treatment; and (4) police interests, including administrative, penological, or investigatory concerns." *Ortiz*, 656 F.3d at 530. Furthermore, the plaintiff must establish a causal link between the defendant's conduct, and the harm complained of. *Id.* In *Ortiz*, the Seventh Circuit explained that the Fourth Amendment analysis is a sliding scale approach that balances the seriousness of the medical need with the scope of the requested care. *Id.* at 531.

Dukes argues that he first requested that the officers consult medical personnel before taking him into custody to determine whether he was healthy enough to travel to the jail. Dkt. 67-2, at 13. Initially, this argument is undermined by the undisputed fact that Dukes attempted to remove the IV himself before medical personnel intervened and convinced him to allow them to remove the IV. But, more importantly, the video evidence establishes that the hospital personnel informed Dukes and the individual City Defendants that Dukes did *not* have any medical holds on him and was free to leave if he wished. Indeed, the FHN nursing supervisor arrived on scene to take Dukes' IV out and was specifically told by Dukes that he wanted the IV out because he was leaving. This can be seen beginning at

36

the eight-minute mark of Officer Fidecki's body camera footage. That same nursing supervisor was on scene when Dukes was arrested. And even if officers were required to consult emergency department personnel before taking suspects into custody (which is a right Dukes has not shown to exist), Dukes can be heard telling Sergeant Zalaznik that he was not an emergency department patient: Zalaznik (speaking to the nursing supervisor): "Are you an ED nurse, Paul?" Dukes: "I'm not in the ED." Zalaznik Body Camera Footage, at approximately six minutes and forty-five seconds. Moreover, although Dukes argues that his "requested treatment" was for the officers to ask the doctor whether Dukes was "healthy enough for transport," Dkt. 67-2, at 13, the video establishes that he never asked the officers to do any such thing.[19]

Based on these facts, no reasonable jury could conclude that the officers on scene acted unreasonably to deny Dukes medical treatment. They were not on notice that Dukes needed additional medical care because he told Sergeant Zalaznik that he was not an emergency patient and because Dukes had the opportunity to return to the hospital and expressly declined. Furthermore, the video evidence conclusively establishes that Dukes never asked the officers to consult hospital personnel regarding his medical needs before the arrest.

After Dukes was placed under arrest, Holden put Dukes in his squad car, at which time Holden removed Dukes' inhaler from his pocket. He then told Dukes

---

[19] This is another prime example of the body camera video recordings disproving a false argument by counsel. Counsel should be more cautious. *See Harlyn Sales Corp. Profit Sharing Plan v. Kemper Fin. Servs., Inc.*, 9 F.3d 1263, 1269 (7th Cir. 1993) ("A lawyer's reputation for integrity, thoroughness and competence is his or her bread and butter.").

that he was taking the inhaler so that it wouldn't fall out of his pocket and that Dukes should just let him know if he needed it. The ride to the police department took only two and a half minutes, and Dukes was alert and talking with Holden for about the first half of the trip. Once at the police department, Holden noticed that Dukes appeared unresponsive and asked if he was alright. Getting no answer, he exited the vehicle, ran to the other side of the squad car, opened the door, and called an ambulance for assistance within a second of opening Dukes' door. Because Dukes appeared to be shaking significantly, Holden believed that he was having a seizure, so that is what he told the dispatcher. After Holden called the ambulance, he tried to assist Dukes, though he did not retrieve the inhaler immediately. Dukes exclaimed multiple times that he could not breathe. Holden responded by urging Dukes to keep talking and to keep breathing. He talked Dukes through the incident until Officer Hilby arrived and took over.

The medical episode, in which Dukes appeared to shake significantly and exclaimed that he was having trouble breathing, lasted just over one minute, at which point Dukes mostly regained his breath on his own, though he continued breathing heavily. Dukes then asked Officer Hilby for his inhaler. Dukes explained that Holden had the inhaler. So, Hilby asked Holden about it, and he retrieved the inhaler from the front of the squad car. Hilby then helped Dukes use the inhaler twice before the emergency response team arrived. Because everyone on scene thought Dukes had a seizure, the officers relayed that message to the emergency response team once they arrived on scene. Later, in the ambulance on the way back

38

to the hospital, Dukes corrected the record and told the responders that he did not have a seizure. Dukes then asked Officer Holden if they needed to return to the hospital. Holden then responded that they needed to ensure he was okay, and that the event was scary and that nobody wanted to see that happen again.

Holden was not on notice of Dukes' medical emergency until he parked the car at the police department and saw that Dukes was unresponsive in the back seat. Before that moment, Dukes was alert and had been talking with Holden. Faced with an unresponsive arrestee, Holden ran to help him, and immediately called an ambulance for help. Holden did not delay in his response. The only possible challenge to Holden's response is that he did not immediately retrieve the inhaler. But Holden thought Dukes was having a seizure. Dukes appeared to be shaking violently, and Holden did not become aware that Dukes hadn't suffered a seizure until later when they were in the ambulance together. And if Dukes were having a seizure, providing an inhaler would be no help. Though Dukes exclaimed that he couldn't breathe, he did not request the inhaler until later when Hilby rendered aid. Holden was not expressly informed that the inhaler was needed. Furthermore, Holden's response clearly indicates that he believed Dukes merely needed to keep talking and keep breathing. He treated Dukes like an anxiety patient, rather than an asthma patient, and Dukes recovered his breath on his own quickly thereafter. Indeed, a reasonable person would wonder what Dukes' damages would be for this brief episode even if a constitutional claim could possibly exist.

39

The primary quarrel with Holden's response can only be that he didn't connect the dots quickly enough. He didn't immediately equate Dukes' exclamations with the need for an inhaler. But courts have indicated that an officer's duty is exhausted when that officer calls an ambulance. *Florek v. Village of Mundelein*, 649 F.3d 594, 601 (7th Cir. 2011); *accord Tatum v. City & County of San Francisco*, 441 F.3d 1090, 1099 (9th Cir. 2006). In *Florek*, the Seventh Circuit held that "reasonableness inquiry necessarily takes into account the sufficiency of the steps that officers did take." 649 F.3d at 600. And courts cannot "require an officer to provide what hindsight reveals to be the most effective medical care." *Id.* Thus, the Seventh Circuit held that officers will typically have acted reasonably when they call an ambulance. *Id.* at 601. This is what Holden did and the Court cannot hold Holden to the rigorous standard Dukes seeks to impose.

In *Estate of Perry v. Wenzel*, the Seventh Circuit explained that merely providing access to medical care may not be dispositive. 872 F.3d 439, 454 (7th Cir. 2017). In that case, the defendants sought medical care for an apparent seizure, but then they failed to render *any* medical care once Perry returned from the hospital. *Id.* at 454. In so holding, the court recognized that officers can be on notice of serious medical needs not only by verbal requests but also by physical symptoms. *Id.* But in that case, the officers failed to provide *any* medical treatment, or to even check vital signs, because they believed Perry was malingering. In this case, when Holden realized that Dukes was nonresponsive, he ran to his aid. When he opened the door and observed what he believed was a seizure, he called the ambulance

within one second of opening the door. Maybe a medical professional would have believed Dukes' trouble breathing was caused not by anxiety or a seizure. Maybe a medical professional would have realized that Dukes was experiencing an asthma attack, not a seizure. But Holden is not a medical professional, and the Court can only determine whether Holden, as a law enforcement officer, acted within the scope of reasonable conduct of a law enforcement officer. *Plumhoff v. Rickard*, 572 U.S. 765, 778–79 (2014) (focusing on reasonableness of an official "in the defendant's shoes"). And because he called for medical assistance immediately, his actions were not objectively unreasonable. *Pulera v. Sarzant*, 966 F.3d 540, 555 (7th Cir. 2020) ("'The Fourth Amendment requires reasonableness, not immediacy.' . . . Perhaps the officers could have acted faster, but the Constitution does not demand perfection." (quoting *Sallenger v. City of Springfield*, 630 F.3d 499, 504 (7th Cir. 2010))).

The Court could stop there, but Dukes' claim against Holden is also barred by qualified immunity. As discussed previously, qualified immunity protects law enforcement officers, as public servants, from liability stemming from "reasonable mistakes made while performing their public duties." *Estate of Perry*, 872 F.3d at 460.

The facts of this case present the quintessential scenario for which qualified immunity was envisioned. In *Estate of Perry*, the Seventh Circuit explained that officers cannot be qualifiedly immune from liability for failure to take *any* action when presented with an arrestee in need of medical care. 872 F.3d at 460. In doing

so, the court held that the Fourth Amendment's objective reasonableness standard is clearly established in the context of an arrestee. *Id.* But nothing in the case law suggests that law enforcement officers need to meet the current medical standard of care to treat arrestees in the short period between calling the ambulance and its arrival. The law does not allow the Court to hold law enforcement officers to a reasonable medical professional standard.[20] *Plumhoff v. Rickard*, 572 U.S. 765, 778–79 (2014) (focusing on reasonableness of an official "in the defendant's shoes").[21]

In this case, the ambulance arrived within a few minutes, and Dukes appeared to recover just over a minute after Holden called the ambulance. Under these circumstances, qualified immunity's function of protecting all but the plainly incompetent or knowing violators would disintegrate if the Court held Holden

---

[20] *Accord Tatum v. City & County of San Francisco*, 441 F.3d 1090, 1099 (9th Cir. 2006) ("Here, the officers promptly requested medical assistance, and the Constitution required them to do no more."). Furthermore, an officer is not required to "provide what hindsight reveals to be the most effective medical care for an arrested suspect." *Florek v. Village of Mundelein*, 649 F.3d 594, 600 (7th Cir. 2011) (citing the Ninth Circuit's opinion in *Tatum*). "Here, we have assumed that an ambulance was called promptly after officers were notified that Florek was experiencing chest pains and wanted an ambulance. That action will typically qualify as reasonable." *Id.* at 601.

[21] The Court finds Plaintiffs' argument particularly curious and a bit disingenuous. First, their own counsel refused to interpret a simple medical record when presented in the Local Rule 56.1 statement of facts. Dkt. 66-3, at 28–29. So, counsel cannot be held to interpreting medical records, but police officers must be able to diagnose arrestees' medical conditions. Plaintiffs' counsel demands the officers know of and implement medical treatments out in the streets yet refuse to admit the contents of a medical record while they sit in the comfort of their office. Next, the gravamen of Dukes' argument is that Holden misinterpreted the medical event Dukes was having. But Dukes' own counsel incorrectly called the medical event a "stroke" throughout the complaint. Dkt, 1. They made this error despite having months to prepare the complaint, pour over medical records, and speak to Dukes. But despite their own error, they have the temerity to assert Holden violated Dukes' constitutional rights because of his misinterpretation of the medical event while it was occurring in the moment in the back of his squad car.

liable. The Seventh Circuit reached a similar conclusion in *Royal v. Norris*, 776 F. App'x 354, 358 (7th Cir. 2019). Distinguishing *Estate of Perry*, the court explained that the defendants had not failed to take action. Indeed, the court again noted that "seeking out paramedics can be a reasonable response to a detainee's medical needs." *Id.* As in *Royal*, Holden's conduct squarely falls within the scope of qualified immunity. He is therefore entitled to judgment as a matter of law.

### 4. Substantive Due Process

Dukes also brings a separate claim that he titles substantive due process. But the claim is entirely redundant of his claim for failure to provide medical care. The City Defendants seek summary judgment on this claim, too. Dkt. 59, at 4. Again, Dukes did not respond. The response brief does not even include the phrase "substantive due process." Dkt. 67-2. Furthermore, Plaintiffs' counsel informed the Court that failing to respond to arguments is his way of abandoning claims that he cannot bring for ethical and professional reasons. Dkt. 90. Thus, in addition to being redundant, Plaintiffs have abandoned the claim and the Court grants summary judgment to the City Defendants.

### 5. Monell

Plaintiffs next bring a claim against the City of Freeport under *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978). But no *Monell* claim can exist without an underlying constitutional violation. Indeed, as the Seventh Circuit recently stated in *Taylor v. Hughes*, the officer's action "caused Taylor no constitutional injury. And so there can be no *Monell* liability." *Taylor*, 26 F.4th at 435. This was a central

43

holding in *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) ("But this was an action for damages, and neither *Monell v. New York City Dep't of Social Services*, 436 U.S. 658 (1978), nor any other of our cases authorizes the award of damages against a municipal corporation based on the actions of one of its officers when in fact the jury has concluded that the officer inflicted no constitutional harm."). As explained above, Plaintiffs have not suffered a constitutional injury. Thus, because a predicate requirement of all *Monell* claims is lacking, Plaintiffs' *Monell* claim must fail.

Even without that fatal defect, summary judgment must be granted to the City of Freeport on this claim. In their complaint, Plaintiffs alleged that the City of Freeport "had in effect racially motivated policies, practices, or customs, that condoned, fostered, and were the driving force of the unconstitutional conduct" of the City Defendants. Dkt. 1, ¶ 137. In their summary judgment memorandum, the City Defendants contend that, after the aid of discovery, Plaintiffs have failed to present any evidence that such policies or widespread customs existed. Dkt. 59, at 5. The City Defendants further argue that Plaintiffs' *Monell* claim is effectively a claim under *respondeat superior* because no evidence exists to implicate anyone with final policymaking authority. *Id.* at 7.

Plaintiffs ignored this argument in their response to the City Defendants' motion for summary judgment. Although sloppy and not best practices, the mere failure to respond on summary judgment is not itself abandonment of a claim. *Robinson v. Waterman*, 1 F.4th 480, 483 (7th Cir. 2021). But here, Plaintiffs' counsel

44

has already informed the Court that his failures to respond were intentional, and that this is his way of complying with his ethical and professional responsibilities to only bring legitimate claims. Dkt. 90. Thus, the Court deems Plaintiffs' *Monell* claim as abandoned, providing yet another basis to grant summary judgment.

### 6. *Willful and Wanton Conduct*

Plaintiffs also bring a claim for willful and wanton conduct against the City of Freeport for the actions of the other City Defendants, who they allege were acting as agents of the City of Freeport.[22] In support, Plaintiffs allege a blunderbuss of acts they believe amounted to willful and wanton conduct. *Id.* ¶ 164. The City's motion for summary judgment on this claim goes through each allegation and explains why each allegation fails to support the claim. Dkt. 59, at 20–23. In response, Plaintiffs assert that they have supported their claims of false arrest, equal protection, and failure to provide medical care, so the Court should leave to the jury the question of whether the City Defendants' actions amount to willful and wanton conduct. Dkt. 67-2, at 15.

But the Court has already explained that the City Defendants are entitled to judgment on these claims. Because the City Defendants did not violate Plaintiffs' constitutional rights, their conduct could not have been willful and wanton. *Horton*

---

[22] The Court does not understand why Plaintiffs have alleged this "claim." It is not a claim. *See Krywin v. Chicago Transit Auth.*, 938 N.E. 2d 440, 452 (2010) ("There is no separate and independent tort for willful and wanton conduct."); *Ziarko v. Soo Line R.R. Co.*, 641 N.E. 2d 402, 406 ("[T]here is no separate and independent tort of 'willful and wanton misconduct.'"). Federal courts have been explaining this for years. *See, e.g., Samuel v. City of Chicago*, 41 F. Supp. 2d 801, 807 (N.D. Ill. 1999). Plaintiffs need to stop pleading willful and wanton as a claim.

*v. Pobjecky*, 883 F.3d 941, 954 (7th Cir. 2018); *Walgren v. Heun*, No. 17-cv-04036, 2019 U.S. Dist. LEXIS 8634, at *28–29 (N.D. Ill. Jan. 17, 2019) ("And because Plaintiffs' constitutional claims fail, so must their willful and wanton conduct claims."). Indeed, willful and wanton is equivalent to deliberate indifference, and the City Defendants' conduct cannot be deliberately indifferent when it was not objectively unreasonable. *See Williams v. Rodriguez*, 509 F.3d 392, 403, 405 (7th Cir. 2007) (explaining that deliberate indifference requires a higher showing than objective unreasonableness and later that the willful and wanton standard is "remarkably similar" to the deliberate indifference standard). The City Defendants are, therefore, entitled to summary judgment on Plaintiffs' willful and wanton conduct claim, which does not even exist.

### B. Hospital Defendants

Plaintiffs' complaint alleged three claims against the Hospital Defendants: intentional infliction of emotional distress, false imprisonment, and negligence. Dkt. 1. Plaintiffs asserted supplemental jurisdiction existed for these claims; diversity jurisdiction does not exist. *Id.*

In response to the Court's inquiry as to their failure to address the summary judgment arguments against their intentional infliction of emotional distress and false imprisonment claims, Plaintiffs informed the Court that they were unequivocally abandoning those two claims. Dkts. 89, 90. So, the Court grants summary judgment in favor of the Hospital Defendants on those two claims. *See Marcure v. Lynn*, 9992 F.3d 625, 631 (7th Cir. 2021) (court may dismiss

nonmovant's claims when its actions evince intent to abandon). This leaves only Plaintiffs' negligence claim against the Hospital Defendants. All federal claims providing a basis for jurisdiction have been resolved.

A district court has discretion to exercise supplemental jurisdiction. *Doe v. Village of Arlington Heights*, 782 F.3d 911, 920 (7th Cir. 2015). "A district court normally should exercise its discretion to dismiss without prejudice a state-law claim, rather than resolve it on the merits, once it dismisses the federal claims that provide the sole basis for original and supplemental jurisdiction." *Hutchinson v. Am. Ass'n for Lab. Accreditation*, No. 21-2289, 2022 U.S. App. LEXIS 6975, at *5 (7th Cir. Mar. 17, 2022) (citing *Al's Serv. Ctr. v. BP Prods. N. Am. Inc.*, 599 F.3d 720, 727 (7th Cir. 2010)); *see also Khan v. Presence Chicago Hosps. Network*, No. 21-2159, 2022 U.S. App. LEXIS 294, at *5 (7th Cir. Jan. 5, 2022) (explaining that because the federal claims "were properly dismissed, the district court was well within its discretion to decline to exercise supplemental jurisdiction"); *Jauquet v. Green Bay Area Catholic Educ., Inc.*, 996 F.3d 802, 812 (7th Cir. 2021). The presumption is to relinquish jurisdiction. *Al's Serv. Ctr.*, 599 F.3d at 727. Relinquishing jurisdiction is the norm, not the exception. *Contreras v. Suncast Corp.*, 237 F.3d 756, 766 (7th Cir. 2001). This practice encourages comity. *Hansen v. Bd. of Trs. of Hamilton Southeastern Sch. Corp.*, 551 F.3d 599, 608 (7th Cir. 2008). Although not unfettered, a district court's discretion is extremely broad. *RWJ Mgmt. Co. v. BP Prods. N. Am.*, 672 F.3d 476, 480 (7th Cir. 2012); *Contreras*, 237 F.3d at 766 (reversed in only

extraordinary circumstances); *Kennedy v. Schoenberg, Fisher & Newman, Ltd.*, 140 F.3d 716, 728 (7th Cir. 1998) ("almost unreviewable").

The Court declines to exercise its supplement jurisdiction over Plaintiffs' negligence claim now that all the federal claims have been resolved. That claim is dismissed without prejudice but without leave to amend in this Court. Plaintiffs can file the negligence claim in the appropriate circuit court, provided they comply with all the requirements for doing so.

## IV. Conclusion

For the reasons explained above, the City Defendants' motion for summary judgment [59] is granted as to all claims. The Hospital Defendants' motion for summary judgment [60] is granted as to Plaintiffs' false imprisonment and emotional distress claims. Plaintiffs' negligence claim is dismissed without prejudice for lack of jurisdiction. Civil case terminated.


Date: April 11, 2022

_____
Honorable Iain D. Johnston
United States District Judge